IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| TERRY L. RENO II, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:14-cv-04311-NKL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Terry Reno seeks review of the Administrative Law Judge's decision denying his application for Social Security Disability Insurance benefits. For the following reasons, the decision of the Administrative Law Judge ("ALJ") is affirmed.

**I.  Background**

The record shows that Reno received consistent medical treatment for physical and mental ailments from 2004 through at least 2014. His alleged onset date is August 16, 2008. Reno's medical records note that he has consistently struggled with gastroparesis and pain throughout his arms, shoulders, joints, knees, and ankles. These symptoms have slightly worsened over time. Scans of Reno's back throughout 2007 and 2008 revealed only minimal disc degeneration. [Tr. 759]. Reno began seeking treatment from a primary care physician in 2009, but the medical records reflect only conservative

1

treatment. *Id.* In 2010, Reno was in a car accident, but CT's revealed only a minor effect on his back. [Tr. 760].

In 2011, Reno began seeing Dr. John Zimmerchied, a VA primary care provider. *Id.* In March 2011, Dr. Zimmerchied noted that Reno was laughing and joking in the waiting room, but began moaning and pretending he could barely walk when he was called in to see the doctor. *Id.* The doctor also noted that Reno was exhibiting drug seeking behavior. *Id.* By July, Dr. Zimmerchied noted that Reno reported that he was off pain medication and that his cervical spine was stable. *Id.* In February 2012, Reno returned to Dr. Zimmerchied seeking narcotics. *Id.* In May 2012, the doctor noted that Reno had excessive pain behaviors and a normal gait unless he was being tested for gait. *Id.* He also noted that Reno had a normal range of motion in the lumbar spine, used his cane incorrectly, and did not clinically need the cane for any identified medical problem. *Id.* Throughout the remainder of 2012 and into 2013, Reno continued to seek medical treatment from Dr. Zimmerchied and other physicians and repeatedly requested narcotic medication. [Tr. 760-61]. Between September 2008 and August 2013, Reno received ongoing treatment from a pain specialist and had nineteen steroid injections in his neck, meant to reduce inflammation and pain.

While being treated for his physical ailments, Reno has also sought treatment from mental health professionals and received diagnoses including depression, anxiety, suicide attempts, panic attacks, and post-traumatic stress disorder ("PTSD"). He was treated with antidepressants while incarcerated off and on between 2006 and 2008. Reno was seen by Dr. Mark Schmitz, a licensed psychologist, once in 2011 and once in 2012 for

2

Dr. Schmitz to produce reports for the Boone County Family Support Division and MO HealthNet (Medicaid). Dr. Schmitz opined that Reno's mental health problems would prevent him from maintaining employment. Reno also met with Peggy Brothers, a mental health professional, once in June 2013. Brothers noted that Reno had a depressed mood with anxiousness but noted no other significant abnormalities. *Id.*

The ALJ denied Reno's request for disability benefits, concluding that he has the Residual Functional Capacity ("RFC") to engage in substantial gainful activity. The ALJ found that despite Reno's severe impairments of arthritis, degenerative disc disease ("DDD"), bipolar disorder versus major depressive disorder ("MDD"), PTSD, and generalized anxiety disorder ("GAD"), he retained the following RFC:

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following nonexertional limitations that reduce the claimant's capacity for light work: can only occasionally lift or carry twenty pounds; can only frequently lift or carry ten pounds; can only sit for six hours total in an eight-hour workday; can only stand or walk for six hours total in an eight-hour workday; must be able to alternate positions between sitting and standing every thirty to sixty minutes for a few minutes at a time while remaining at the work station; can never climb ladders, ropes, or scaffolds; ca only occasionally climb ramps or stairs; can only occasionally stoop, kneel, crouch, or crawl; can understand, remember, and carry out simple instructions consistent with unskilled work; can perform only simple decisionmaking related to basic work functions; can tolerate only minor, infrequent changes within the workplace; and can only occasionally have contact with co-workers and supervisors; can have no contact with the general public.

[Tr. 756-57].

Reno testified at the administrative hearing that he left his prior job at Steak 'n Shake due to extreme panic attacks and an inability to be around noise and people. [Tr.

3

Case 2:14-cv-04311-NKL   Document 22   Filed 08/25/15   Page 3 of 15

758]. He stated that on a weekly basis he has episodes of vomiting blood after eating, severe stomach and lower extremity pain, nausea, and bloody stools. *Id.* He stated that he has used a prescribed cane for five or six years due to knee problems and his tendency to lose his balance. *Id.* He cannot carry more than ten pounds for a short period of time and lifting, standing, or sitting worsens his back pain. *Id.* He stated that he can sit for fifteen to twenty minutes and stand for ten to fifteen minutes. *Id.* His neck injections are extremely painful and only help him minimally. *Id.* Though he has been offered a couple of surgical procedures, he is afraid. *Id.* He currently hears voices daily, though his medications help reduce them. *Id.*

In her opinion, the ALJ concluded that Reno has only mild restriction in activities of daily living, as he testified that he does laundry, dishes, and basic cleaning. [Tr. 756]. The ALJ noted that Reno cooks breakfast and dinner for his children. *Id.* While Reno stated that he has difficulty focusing, he regularly watches television and reads. *Id.* The ALJ also noted that the record does not reflect that Reno had significant difficulties with cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for his grooming and hygiene, using telephones and directories, or using a post office. *Id.* The ALJ concluded that Reno has moderate difficulties in social functioning as he does not like to leave the house or have people over, but that during his alleged period of disability he was able to start and continue romantic relationships, which suggested no more than moderate limitation. *Id.* Reno was also determined to have moderate difficulties with concentration, persistence, and pace. *Id.*

4

The ALJ concluded that though Reno has mental diagnoses which constitute severe impairments, the record does not support Reno's claims about the severity of his symptoms. She noted that Reno has no history of hospitalization or treatment for suicide attempts throughout the alleged period of disability, despite reporting suicidal ideation. *Id.* The ALJ found that the psychologists' treatment notes in the record reflect no significant increase in mental symptoms outside of stressors. [Tr. 762]. The ALJ rejected the conclusion of Mark Schmitz, a licensed psychologist, whose "mental status examinations of the claimant do not reflect any significant abnormalities other than symptoms reported by the claimant." *Id.* The ALJ concluded that Reno's allegedly limited daily activities could not be verified with any degree of certainty, and that Reno reported fairly normal activities of daily living many times throughout the record. [Tr. 763]. The ALJ also considered Reno's work history, which only showed that he worked sporadically with poor earnings prior to his alleged onset date. *Id.* The ALJ concluded that this work history did not enhance the credibility of his allegations. *Id.*

The ALJ also concluded that the medical evidence of the record does not support Reno's statements about the intensity, persistence, and limiting effects of his symptoms. [Tr. 759]. The ALJ found that Reno has not generally received the type of medical treatment one would expect for a disabled individual, and that despite receiving consistent treatment from primary care physicians and a pain specialist, the "record reflects that the treatment was generally successful in stabilizing the claimant's condition." *Id.* The treatment was also relatively routine and conservative in nature. *Id.* The ALJ found significant that the record did not reflect Reno receiving escalating

5

treatment, such as increased frequency of treatment, use of a TENS unit, physical therapy, a walker, wheelchair, ER visits, inpatient hospitalization, specialist care, surgery, recurrent individual mental health therapy, group therapy, or temporary holds. *Id.* The ALJ also noted that the record did not reflect that Reno received any diagnostic imaging after March 2011, and that prior imaging did not reveal significant problems. [Tr. 761].

In evaluating the medical opinion evidence of the record, the ALJ gave partial weight to the opinions of Dr. Bruggerman, Reno's primary care physician, who noted that he did not have access to all of Reno's previous medical records, but opined that due to two significant back surgeries Reno would have significant functional limitations. [Tr. 764]. However, the record does not reflect that Reno ever had either of the surgeries mentioned by Dr. Bruggerman. *Id.* The opinions of Dr. Glen Frish, a non-examining state agency psychological consultant, were given great weight as they were generally consistent with the medical record of evidence as a whole. [Tr. 765]. The opinions of Dr. Schmitz were given little weight as they were based heavily on Reno's own statements about his limitations and symptoms, which were uncritically accepted as true. *Id.*

Relying on the testimony of a vocational expert, the ALJ concluded that given Reno's RFC, he would be able to maintain substantial gainful employment as a laundry worker, office helper, or bench assembler. [Tr. 768].

## II. Standard of Review

"[R]eview of the Secretary's decision [is limited] to a determination of whether the decision is supported by substantial evidence on the record as a whole. Substantial

6

Case 2:14-cv-04311-NKL   Document 22   Filed 08/25/15   Page 6 of 15

evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision 'simply because some evidence may support the opposite conclusion.'" *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Substantial evidence is "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010).

## III. Discussion

Reno contends that the ALJ's decision is not supported by substantial evidence because the RFC determination is based on conclusory statements of a non-treating, non-examining physician, and does not reflect the weight of the evidence of the full record.

Reno first takes issue with the ALJ's adoption of the opinion of Dr. Glen Frish, a non-examining state psychiatric consultant. Dr. Frish opined that Reno was not significantly limited by any of his mental impairments. [R. 456-69]. Reno contends that this adoption was problematic because Dr. Frish was a non-examining, non-treating physician and the vast amount of psychological evidence in the record is from after Dr. Frisch rendered his opinion in January 2009. Reno argues that this timing indicates that the evidence relied upon by the ALJ is from Reno's prior claim.

While non-treating, non-examining physician opinions are generally not entitled to significant weight, the circumstances of the individual case must be considered in evaluating the weight to give to each specific medical opinion. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (noting that no other doctor reached the same

7

conclusion as the claimant's psychologist, and that "[t]he ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole").

While Dr. Frish rendered his opinion in 2009, less than a year after Reno's onset date, the ALJ did not simply adopt Dr. Frish's conclusions in formulating the RFC, but justified the weight she assigned the opinion with a lengthy discussion of the remainder of Reno's mental health records which she concluded supported Dr. Frish's evaluation. She found that the medical evidence regarding Reno's pattern of treatment was consistent with Dr. Frish's conclusions and based her adoption of Dr. Frish's opinions off of Reno's medical records showing conservative, routine mental health treatment which was generally successful at alleviating Reno's symptoms. The ALJ also independently considered Reno's credibility and factored those findings into the weight she assigned to the medical opinions of the record. As the ALJ considered the entirety of the record in formulating her opinion, the timing of Dr. Frish's opinion and the ALJ's reliance on its conclusions does not make the RFC unsupported by substantial evidence of the record.

There is only one mental health opinion in the record that conflicts with Dr. Frish's conclusions. Dr. Schmitz opined in 2011 after examining Reno once that his mental health condition would likely prevent him from maintaining employment. The ALJ rejected Dr. Schmitz's 2011 opinions because they were "based upon a limited examination of the claimant and are not reflective of the longitudinal evidence of the claimant's functioning. Additionally, . . . Mr. Schmitz apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." [Tr. 765].

8

While Reno's contention that psychiatric examinations inherently involve interpretation of the patient's complaints is accurate, substantial evidence supports the ALJ's decision to discount Dr. Schmitz's conclusions here given her findings regarding Reno's credibility.

The ALJ concluded that Reno was not credible regarding the extent of his symptoms given his minimal treatment and a history of exaggerating symptoms to medical professionals. For example, Dr. Zimmerchied noted that at one appointment, Reno was laughing and joking while waiting for his appointment, but began moaning and limping upon being called for his examination. Dr. Zimmerchied also noted that he exaggerated his gait while being examined for problems, but had a normal gait otherwise. The record further reveals that Reno has a history of seeking narcotics from his doctors. While these pieces of evidence do not directly bear on Reno's mental capabilities, they do suggest that Reno has a history of dishonesty with health care providers. Additionally, the ALJ concluded that Reno's activities of daily living suggested that he was significantly less limited in mental functioning than he claimed. For example, Reno was able to care for his children, take care of himself and his home, and even begin and maintain romantic relationships at various points. These abilities support the ALJ's conclusion that Reno's credibility regarding the extent of his mental symptoms was limited.

Given the ALJ's credibility finding, her decision to afford little weight to Dr. Schmitz's is supported by the record. While psychiatric evaluations undoubtedly require the medical provider to listen to and consider a patient's statements regarding their

9

symptoms, where the ALJ determines that a claimant's subjective complaints are not credible and a doctor's opinion relies on those subjective complaints, the ALJ is entitled to afford the opinion less weight and further discount or disregard conclusions based upon those subjective complaints. *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014). The ALJ also noted in reviewing Dr. Schmitz's opinion that it was not reflective of "longitudinal evidence" of Reno's functioning. In fact, Dr. Schmitz only evaluated Reno twice, once in 2011 and once in 2012. As the ALJ's evaluation Reno's credibility was based on her review of his medical records spanning from 2004 through 2014, rather than two isolated mental health evaluations where there is no suggestion that Reno's credibility was extensively considered, substantial evidence supports her conclusion that Dr. Schmitz's opinion should receive little weight.

Outside of Dr. Schmitz, no doctor opined that Reno's mental health would prevent him from maintaining substantial gainful activity. The medical records all reveal minimal, routine mental health treatment which generally improved Reno's mental health functioning outside of periods where Reno experienced stressors. The ALJ's determinations regarding the weight to afford the mental functioning opinions of the record is supported by substantial evidence of the record.[1]

---

[1] Reno contends that the ALJ is required to use a Psychiatric Review Technique ("PRT") to evaluate a claimant's severe mental impairments, and that her failure to do so here constitutes error. While the ALJ is required to determine whether the claimant has a mental impairment and rate the degree of functional limitation resulting from the mental impairment, "it is permissible for the analysis to be included [by the ALJ] within the written decision such that the use of a written form is not required." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007). Reno does not explain how the ALJ's discussion of the degree of mental impairments here was insufficient. The ALJ's opinion contains a

Reno next contends that the ALJ failed to justify her conclusions regarding his mental RFC limitations with medical evidence. As noted above, the ALJ concluded in the RFC that Reno:

> can understand, remember, and carry out simple instructions consistent with unskilled work; can perform only simple decisionmaking related to basic work functions; can tolerate only minor, infrequent changes within the workplace; and can only occasionally have contact with co-workers and supervisors; can have no contact with the general public.

[Tr. 756-57].

When the ALJ determines a claimant's RFC, she "is not limited to considering medical evidence exclusively," and should base the determination on all of the evidence of the record. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). However, the RFC is a medical question and must be supported by at least some medical evidence. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).

The ALJ's RFC conclusions are consistent with Reno's exhibited abilities during his mental health evaluations. For example, Dr. Schmitz noted that Reno was oriented, able to spell "world" backward, remember random digits forward and backwards, perform series threes, remember three objects immediately, recall two of three objects after a delay, and interpret proverbs successfully. He was also capable of taking care of his children and maintaining romantic relationships. While the record reveals that Reno has sought mental health treatment since his onset date and received numerous diagnoses,

---

thorough analysis of Reno's history of mental health treatment, as well as a discussion of how Reno's medical records and activities of daily living affected the RFC determination. [R. 761-63]. These discussions are sufficient to meet the PRT requirement.

he received only conservative treatment with antidepressants. Though he reported having suicidal ideations and attempting suicide on occasion, he was never hospitalized for mental health problems and the record does not reveal him receiving any emergent treatment for suicide attempts. Reno's treatment record and activities of daily living all provide substantial evidence to support the RFC determination, and any failure of the ALJ to specifically state how Reno's abilities affected the RFC determination constitutes harmless error.

Reno also argues that the ALJ erred in "picking and choosing" different pieces of medical evidence to justify her conclusions, rather than evaluating the record as a whole. All of Reno's examples of "picking and choosing" relate to minor pieces of evidence in the record not essential to the RFC finding. Reno states that while the ALJ concluded that "claimant also testified that he cooks breakfast and dinner for his children every day," Reno actually testified that he cooks for his children only when he sees them which is two or three days per week and otherwise does not cook for himself. The minor discrepancy between the ALJ's opinion and the record does not suggest that the ALJ was picking and choosing evidence. Moreover, Reno's ability to cook for his children and apparent choice not to do so in the absence of his children does not suggest that he is more limited than found by the ALJ. Reno also states that the ALJ's conclusion that the record does not reflect significant difficulties with hygiene and grooming ignores his statement that he often doesn't feel like showERing or bathing every day. While Reno may not bathe daily, the record does not reflect that any medical provider or family member or friend ever suggested that he had any significant hygiene problems. Reno

12

also takes issue with the ALJ's statement that he had no exhibited problems using "public transportation," which is only minimally available where Reno lives in Centralia, Missouri. The ALJ's offhand reference to public transportation which may not exist in significant quantities in Centralia does not suggest that Reno is any more or less limited than found by the ALJ.

The ALJ also noted at points that Reno's treatment "has been essentially routine or conservative in nature" and "[t]he record does not reflect escalating treatment modalities, such as . . . specialist care or surgery . . . ." Reno contends that these conclusions are erroneous given his nineteen steroid injections and treatment by a pain specialist. Despite the ALJ's remarks regarding the lack of specialist treatment, she discussed at numerous points that Reno has received ongoing treatment from a pain specialist and been treated with numerous steroid injections. As she discussed the entirety of the treatment Reno received and clearly considered the specialist treatment Reno received, her offhand statement regarding the lack of specialist treatment does not constitute harmful error. Reno also contends that the steroid injections he received were far more invasive than recognized by the ALJ. While Reno's contention regarding the invasiveness of the process may be accurate, the routine nature of the treatment and its success in temporarily alleviating his symptoms suggests that the steroid injections and accompanying pain did not incapacitate Reno. The record does not reveal that he ever underwent surgery or considered more invasive pain treatment. Moreover, Dr. Street, Reno's pain specialist, did not suggest in his treatment notes that these steroid injections made Reno incapable of maintaining employment or significantly limited him in any way. In fact, though Reno

13

has received treatment from numerous doctors and psychologists over the last decade, no medical record or opinion in the record other than Dr. Schmitz's and Dr. Bruggerman's (which referenced surgeries Reno never had and was not based on a full review of Reno's medical records) suggests that Reno is severely limited or incapable of maintaining employment.

The ALJ's citation of other treatments Reno did not receive, which Reno contends are irrelevant given that no doctor ever opined that such treatments would be helpful to him, does not discredit the ALJ's opinion in this case. The ALJ merely cited examples of treatment indicating severe disability which Reno did not receive. She does not suggest that Reno should have received any of this treatment. Moreover, in the absence of doctors' notes suggesting that Reno is significantly impaired in functioning, these more invasive treatments would provide the only objective basis for the ALJ to conclude that Reno is disabled. Her notation that she reviewed Reno's records for such objective indicators and failed to find evidence of invasive treatment or disability suggests her opinion was based on a thorough review of the medical evidence.

Given the lack of reliable opinion evidence in the record to suggest that Reno is severely limited in functioning and absence of medical records or treatment to support Reno's contention that his physical pain and mental deficiencies are incapacitating, the Court cannot conclude that the ALJ's opinion is deficient or unsupported by substantial evidence. It is the claimant's burden to prove his disability. *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004). While Reno's history of treatment for pain including repeated steroid injections suggests that his allegations of pain are at least partially

14

credible, this piece of evidence alone is insufficient to justify the Court overturning the ALJ's determination given the absence of medical opinions or other treatment to indicate that Reno's pain is disabling, particularly in light of the ALJ's credibility finding which is amply supported by the record. Based on the current record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## IV. Conclusion

For the reasons set forth above, the ALJ's decision is affirmed.

<u>/s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>August 25, 2015</u>
Jefferson City, Missouri